HEAGY and Another *v.* CHEESMAN, Administrator.

WILL.— *Construction of.*—A will contained the following clauses: "I give and devise to my beloved wife the farm on which we now reside, situate," &c., "containing," &c., "during her natural life, and all the *stock*, household goods, furniture, provisions, and other goods which may be thereon at the time of my decease, during her natural life, she, however, selling so much thereof as may be sufficient to pay my just debts;—in case there is not a sufficiency of *stock* to pay my debts, then to dispose of so much of the land as will satisfy the balance; at the decease of my wife the foregoing property to be equally divided between our legal heirs. I authorize my executors, if it shall become necessary to pay my debts, to sell by private sale, or in such manner and upon such terms as they may think proper, any part of my real estate sufficient to pay said debts."

At the time of the execution of the will, which was some years prior to the death of the testator, the value of his domestic animals on the farm exceeded the amount of his indebtedness, and he also owned a large amount of other personal property. At the time of his death, without issue, the live stock owned by him was not sufficient to discharge the liabilities of his estate.

Heagy and Another *v.* Cheesman, Administrator.

*Held*, that, for the payment of debts, according to the will, the live stock was first to be exhausted, and next the land was to be resorted to.

APPEAL from the Wayne Common Pleas.

FRAZER, J.—In 1849, the testator, William F. Culbertson, a farmer, executed a will, and subsequently, in 1864, he died, without issue, leaving a widow surviving him. When the will was executed, his live stock, such as horses, cattle, hogs, and sheep, exceeded in value the amount of his indebtedness. He had also at that time a large amount of other personal property, such as farm produce, farming utensils, wagons, carriages, &c. Afterwards he became more largely indebted, so that the live stock owned by him at the time of his death was not sufficient to discharge the liabilities of his estate. The will contained the following clauses:

"Item 1st. I give and devise to my beloved wife the farm on which we now reside, situate," &c., "containing three hundred and ten acres, during her natural life, and all the *stock*, household goods, furniture, provisions, and other goods which may be thereon at the time of my decease, during her natural life as aforesaid, she however selling so much thereof as may be sufficient to pay my just debts; in case there is not a sufficiency of *stock* to pay my debts, then to dispose of so much of the land as will satisfy the balance. Item 2d. At the decease of my wife the foregoing property to be equally divided between our legal heirs. Item 3d. * * * I authorize them (the executors), if it shall become necessary to pay my debts, to sell by private sale, or in such manner, and upon such terms as they may think proper, any part of my real estate sufficient to pay said debts," &c.

The question presented is, whether, after the live stock, the farm was, according to the will, next to be resorted to for the payment of the debts. The court below resolved this question in the affirmative, but the appellants insist that the personal estate should first be exhausted.

The decision appears to depend upon the meaning of the

word "*stock*," as used in that part of the will which directs, that "in case there is not a sufficiency of *stock* to pay my" (the testator's) "debts, then to dispose of so much of the land as will satisfy the balance." If, in thus using the term "stock," the testator intended to include his whole personal estate, then the court below erred; but if he meant by it only domestic animals, such as horses, cattle, sheep, swine, and the like, then the judgment should be affirmed.

We are of opinion that the term "stock" was used by the testator in its agricultural sense, as signifying domestic animals and nothing more. The context seems to forbid any larger definition. In this sense, obviously, the word was used in the preceding part of the same clause which enumerates the property bequeathed—"all the *stock*, household goods, furniture, provisions, and other goods and chattels" which might be on the farm at his decease. It is not to be supposed, without something to indicate it, that the same word was again used in the same clause, and, indeed, in another member of the same sentence, in a different sense. Strong support is also given to this construction by the circumstance that at the time the instrument was executed the proceeds of the sale of the domestic animals which were then owned by him, and upon the farm, would probably have constituted a fund sufficient for the purpose intended.

The observation of Lord Coke, that "wills and the construction of them do more perplex a man than any other learning, and to make a certain construction of them, this *excedit jurisprudentiæ artem*," is quite as true now as when it was uttered. Indeed, it is highly probable that in this country these instruments are more frequently prepared without the aid of professional skill and legal knowledge than in England, and consequently that the American courts are, and have been, peculiarly vexed with such questions. We do not, however, feel any difficulty in the present case. Settled rules of construction, based upon principles of obvious reason, seem to us to make it plain; thus, Mr. Jarman's

tenth rule: "courts will look at the circumstances under which the devisor makes his will—as the state of his property, of his family, and the like;" and the eighteenth, "that words occurring more than once in a will shall be presumed to be used always in the same sense, unless a contrary intention appear by the context, or unless the words be applied to a different subject;" and the twenty-first, "that the construction is not to be varied by events subsequent to the execution," &c.

Judgment affirmed, with costs.

*J. B. Julian* and *J. F. Julian*, for appellants.

*W. A. Peelle* and *H. C. Fox*, for appellee.